**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MOHAMMED HUSSEIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **2:09-cv-00547** |
| **v.** | ) | |
| | ) | |
| **UPMC MERCY HOSPITAL** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

Presently pending before the Court for disposition is the MOTION FOR SUMMARY

JUDGMENT (Doc. No. 26), filed by defendant UPMC Mercy Hospital ("UPMC" or

"Defendant"); and the MOTION FOR SUMMARY JUDGMENT filed by plaintiff, Mohammed

Hussein ("Hussein" or "Plaintiff") (Doc. No. 29). The motions have been fully briefed (Doc.

No. 27, 32, 41, 43, 45) and the factual record has been thoroughly developed via the submission

of the parties' extensive appendices and CONCISE STATEMENTS OF MATERIAL FACT

(Doc. Nos. 26, 30) with responses thereto (Doc. Nos. 40, 42). Accordingly, the motions are now

ripe for disposition.

### PROCEDURAL HISTORY

All of the claims, and the basic issues of this lawsuit, flow from the allegedly unlawful

termination of Hussein's employment by UPMC.

On July 29, 2008, Hussein timely filed a charge of employment discrimination on the

basis of religion, age, national origin, and retaliation with the Equal Employment Opportunity

Commission ("EEOC") against his former employer, UPMC. These charges were also filed with

the Pennsylvania Human Relations Commission. A Notification of Right to Sue was purportedly

received by Plaintiff from the EEOC on or about February 20, 2009. UPMC does not dispute

that Hussein properly exhausted all of his administrative remedies, as the law requires.

Thereafter, on May 5, 2009, Hussein initiated this lawsuit by the filing of a five-count Complaint (Doc. No. 1) in which he alleges that he was subjected to unlawful discrimination and retaliation by UPMC on the basis of his religion, national origin, and age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), the Age Discrimination & Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA"), and the Pennsylvania Human Relations Act ("PHRA"), 42 Pa. Cons. Stat. § 951, *et seq.* UPMC timely answered (Doc. No. 5) and after extensive discovery, both parties filed the instant Cross-Motions for Summary Judgment.

**STANDARD OF REVIEW**

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986) (quoting Fed. R. Civ. P. 56(e) (emphasis in original)). An issue is genuine only "if

the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986).

When the parties have filed cross-motions for summary judgment, as in this case, the summary judgment standard remains the same. *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F.Supp.2d 425, 430 (M.D.Pa. 2006). "When confronted with cross-motions for summary judgment, . . . 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.'" *Id.* (quoting *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 Fed. Appx. 266, 270 (3d Cir. 2006)). "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts." *Id.* (citing *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998)).

In federal employment discrimination cases, the familiar *McDonnell Douglas* formulation regarding the appropriate burdens of proof and allocation of production of evidence governs and guides the analysis of the evidence presented on a motion for summary judgment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, the plaintiff must establish a *prima facie* case of discrimination; if this burden is met, the defendant must then articulate some legitimate, nondiscriminatory reason for the employee's treatment. *Id.* at 802. If the defendant articulates a legitimate, nondiscriminatory reason for the employee's treatment, then the plaintiff must demonstrate that the defendant's stated reasons were a pretext for unlawful action. *Id.* at 804. The *prima facie* case under *McDonnell Douglas* "is not intended to be onerous." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995), *cert. denied*, 515 U.S. 1159 (1995). The *prima facie* case raises an inference of discrimination because the courts

presume that the challenged acts, if otherwise unexplained, are "more likely than not based on the consideration of impermissible factors." *Id.*

BACKGROUND

The following facts are taken from the Court's independent review of the parties' motions, the filings in support and opposition thereto, and the record as a whole. As the law requires, all disputed facts and inferences are to be resolved in favor of the nonmoving party.

It appears that the basis of this lawsuit arises from a number of events that occurred in June 2006 and in April 2008. The underlying facts of this case are at times unclear and many of the non-material issues of fact are disputed. However the summary judgment record is clear on the determinative issue: there simply is no summary judgment record evidence from which a reasonable factfinder could conclude that any alleged discriminatory or retaliatory acts relate to the denial of a 2006 vacation request by Hussein's department director, nor is there any summary judgment record evidence from which a reasonable factfinder could find that the termination of Hussein's employment resulted from his subsequent complaints to the department's upper-level supervisors about that refusal to grant Plaintiff's requested vacation time.

A.    <u>Plaintiff's employment with UPMC</u>

On October 18, 1976, Plaintiff began his employment as a nuclear medicine technologist at Mercy Hospital, a hospital within the UPMC system. In that position, Plaintiff's job duties included performing diagnostic tests involving radioactive isotopes. Inherent with the duties of a nuclear medicine technologist is the responsibility for accurate completion of medical documentation. Given the fact that accurate record keeping is critical to the performance of this position, the corrective action and discharge policy of UPMC, Policy HS-HR0704, provided that dishonesty and falsification of records are grounds for immediate discharge. UPMC counseled

Plaintiff on the corrective action policy for various performance-related deficiencies on numerous occasions during his tenure.

Within the Radiology Department at Mercy hospital, Plaintiff was directly supervised by a lead nuclear medicine technologist, who reported to the Director of Radiology. Over the course of Plaintiff's employment, his lead technologist supervisor changed on occasion.

Plaintiff is a practicing Muslim of Pakistani descent. Among other things, Plaintiff observed Ramadan and made two pilgrimages to Mecca (in 1996 and again in 2007). According to Plaintiff's own description of the requirements of the practice of his faith, a Muslim is required to perform one pilgrimage to Mecca within his lifetime, but may undertake more than one if he has the means and ability to do so. Additionally, while working at Mercy hospital, Plaintiff prayed daily during his lunch hour, which required privacy and took approximately ten minutes. Prior to 2007, Plaintiff would pray in a lounge at one of the hospital's nursing stations. In 2007, Plaintiff was permitted to pray in the private office of Amy Dietz, his direct supervisor at the time.

Relevant to Plaintiff's claims in this suit is the vacation policy of the Radiology Department. Under that policy, each employee chose in advance periods of time during the calendar year (in increments of work weeks) to be taken as vacation. The policy is essentially a turn-based process in which one employee at a time would request vacation time, and proceeded by "rounds". In terms of the actual process utilized, according to the policy:

1. Two seniority lists will be developed.

   - PMHS Seniority – the date hired by PMHS

   - Section seniority – The date that the employee transferred into the section. Each section will provide a listing along with vacation grid to be completed and returned to the Technical Operation Manager or Director by the last day of February. The vacation grid designates the number of staff permitted to take vacation for a week.

2. The first round will be chosen by PMHS seniority. The second round will be chosen by section seniority. All subsequent rounds will be chosen by PMHS seniority.

3. One week of vacation will be chosen at a time. The employee must be able to accrue enough vacation time by the time the week is taken.

4. Each employee will have 24 hours to schedule his or her week. Any employee that does not make a decision within this time frame will forfeit their pick and be put at the end of the list for that round of vacation picks.

5. If the employee wants to take two or more weeks together, the employee must forfeit his or her pick for round one and pick two weeks together in round two. Any vacation taken in two weeks increments must be approved by the Director of Radiology.

Two aspects of this policy are particularly notable, the seniority system for choosing time periods for vacation, and the setting of the vacation calendar in advance for all employees within the Department, specifically by the last day of February. This is consistent with the express purpose of the policy, which was to develop guidelines "[i]n order to provide equity in the vacation selection process and to support the staffing needs of the Radiology Division". Given his seniority, Plaintiff had the first selection to choose his period for vacation within the Radiology Department under this policy.

B. Plaintiff's June 2006 request for vacation

On June 12, 2006, Plaintiff requested time off from December 24, 2006 through January 4, 2007 to travel to Mecca for a religious pilgrimage. In explaining the basis of his request on the request form, Plaintiff explained that he had been offered an opportunity to travel as part of a group of 40 people departing from the Pittsburgh area at a reduced rate, and that he wanted to take advantage of the offer. See Doc. No. 28-3 at p. 32 (Plaintiff's request for personal/vacation day). His request was denied by Becky Volk ("Volk"), the Radiology Department director. Plaintiff alleges that Volk's denial was based upon religious discrimination. UPMC contends that the request was denied because it was made well after the

vacation calendar for the year had been established and that a fellow employee had previously been approved for leave on the week requested by Plaintiff. Plaintiff disputes that the denial was based upon concerns for a staffing shortage during the holiday season and alleges that the vacation time for the other employee, a radiation safety officer, had no bearing on the proper staffing of his department since the majority of her assignments were in a different department. Plaintiff does concede, however, that his request was untimely and admits to the possibility that the denial of his vacation request was motivated by Volk's desire to adhere to Defendant's policies.[1]

C.      Complaints Made By Plaintiff to Sister Patricia Hespelein

In October 2006, Plaintiff claims that he levied complaints about the denial of his untimely vacation request to Sister Patricia Hespelein, whom he believed to be a member of upper management. During their conversation, Plaintiff alleges that he communicated Volk's allegedly discriminatory actions to Sister Hespelein, testifying during his deposition as follows:

> I told her that, Sister, this is the first time I am coming to you. I need you a favor [sic]. I had requested Becky Volk to go to pilgrimage, and she did not grant my request, and I feel that, you know, my religious rights were violated because I was always routinely covering for my Christian co-workers for all these years, and she said, well it is October now, isn't it too late? I said yes, my chance is gone, and it is already filled up now, and she said what I'll do is I'll talk to Becky Volk next year, and we will make sure that you are able to go to pilgrimage in 2007.

(Doc. No. 28-2 at 152). Plaintiff is under the impression or belief that Sister Hespelein eventually communicated these complaints to Volk in February 2007, which in turn resulted in Plaintiff being permitted to travel to Mecca for his second religious pilgrimage at the end of that year.

Notwithstanding Plaintiff's assumptions in this regard, it is unclear whether Sister

---

[1] Plaintiff claims that the late submission occurred because he did not learn of the opportunity to travel to Mecca with a group from Pittsburgh with a monetary discount until June 2006.

Hespelein actually voiced the concerns of Plaintiff to Volk. There is no record evidence beyond Plaintiff's speculation and hearsay that such a conversation ever occurred. More specifically, Hussein admits to only speculating as to whether Sister Hespelein ever spoke to Volk, although he testified in his deposition that Volk informed him that she spoke to Sister Hespelein and that Volk "showed her displeasure for [him]" and "was furious" that he spoke to Sister Hespelein. For her part, Sister Hespelein does not recall talking to Volk. Similarly, Lisa Elizabeth Haskins, Manager Technical Operations at UPMC Mercy Imaging Services, testified that she heard that Sister Hespelein had spoken to Volk about Hussein's complaints; Amy Dietz, another nuclear medicine technologist, testified that another technologist informed her that a conversation between Volk and Sister Hespelein occurred; and Amy Helfrich, the then-lead technologist, stated that Volk informed her that a conversation took place between Volk and Sister Hespelein. This testimony, it bears noting, does not reflect first-hand knowledge with respect to any conversation between Volk and Sister Hespelein; these witnesses essentially testify to overhearing secondhand information about such a conversation. Lastly, the Court notes that neither party deposed Volk during the discovery phase of this litigation.

D.     The Termination of Plaintiff's Employment

On April 24, 2008, UPMC terminated Plaintiff's employment. The termination letter cited instances of "dishonesty and falsification" based on occurrences in the work place as justification for the dismissal. With his motion for summary judgment, Plaintiff objects to each charge, claiming that they constitute either a common practice or a false allegation, and that the decision to discharge him was actually in retaliation.

Defendant cites two incidents of alleged dishonestly and falsification as the basis for the termination action. An incident allegedly occurred on April 12, 2008 which concerned

Plaintiff's supposed failure to discuss with certain doctors that there was a problem with the taking of images on a particular renal scan that he performed on a patient.  During the scan in question, the imaging study apparently started, stopped, and then restarted five minutes later, which resulted in missing images.  According to Defendant, Plaintiff delivered the results of the scan to the doctor who ordered it, but failed to bring the stoppage of the equipment and the resulting missing images to that doctor's attention.  Despite not being informed of the missing images by Plaintiff, the doctor recognized that a problem existed with the scan, and approached a second doctor in order to determine what the problem was.  Together, both doctors apparently were able to determine that images were missing.  The following Monday, April 14, 2008, one of the two doctors brought the matter to the attention of Amy Dietz, the lead technologist and Plaintiff's immediate supervisor at the time.  Dietz commenced an investigation, specifically speaking with the two doctors and Plaintiff.  According to both doctors, Plaintiff failed to bring the missing images to their attention.  Plaintiff claims that he did.  More specifically, Plaintiff claims that he orally notified both doctors, and that he affixed an adhesive note to the patient's requisition form alerting the personnel in the radiology department that "Dr. Schultheis and Dr. Scalerico said to repeat the study on Monday when the camera was fixed."  *See* Doc. No. 28-1, Depo. Tr. of Plaintiff, at transcript page 58.  All three do agree that missing images on a renal scan can be quite significant and that someone reading the official medical documentation of the April 12, 2008 test would have no way of knowing that there were problems with the scan.

In the course of conducting her investigation into the missing scans, Dietz learned about an earlier incident involving Plaintiff.  On April 3, 2008, Plaintiff allegedly falsified documentation by improperly placing the initials of another nuclear technician on the forms that were used to show that certain quality control tests had been performed on the cameras in the

cardiology lab.  Present in the cardiology lab along with Plaintiff that day were co-workers

Dennis King and Sharon Boros.   King, a biomedical engineer, installed a new gadolinium source

in a specific camera (referred to as the "north camera").  Under the department procedure for

such an installation, a quality control scan is made in order to ensure that the camera is in

working order.  King was unfamiliar with how to perform the quality control scan.   Likewise,

Plaintiff was unfamiliar with how to conduct the quality control scan (also referred to as a "blank

scan").  Boros, another fellow nuclear medicine technologist with Plaintiff, had received

advanced training with the camera, and agreed to show Plaintiff how to conduct the scan.  Boros

showed Hussein how to retrieve the proper data set, and left the department prior to the initiation

of the scan.  Hussein then initiated the blank scan and upon completion, he listed both his name

and Boros' initials on the north camera quality control logbook.

Boros later discovered that Hussein added her initials and she complained to Dietz.

Dietz conducted an investigation and concluded that the April 3, 2008 documentation was false.

Dietz' conclusion was based, in part, upon the following written statement from Dennis King:

> On Thursday, April 3, 2008, Sharon Boros showed me how to acquire a blank
> scan on the north camera in nuclear cardiology.  However, Mohammed "Ash"
> Hussein was the technologist who performed the scan start to finish.

*See* Doc. No. 28-3 at p. 24.  Plaintiff admits that he initialed Boros' name on the quality control

log for the north camera so that she would receive credit, and he claims that his actions were

commonplace within the department.  Likewise, Boros testimony now indicates that she

"changed her mind" after she levied the complaint, no longer believing that Hussein did anything

wrong when he wrote her initials on the quality control sheet for the North Camera, and would

have written Hussein's initial in a similar situation.

The termination letter also cites to a third incident on April 13, 2008; however, the

record neither provides specifics with regard to that alleged infraction nor supports Hussein's

claim that the matter involved placing the initials of Boros on the north camera. Additionally, Hussein's citation to the record in support of the April 13, 2008 claim cites facts that actually relate to the April 3, 2008 incident.

According to Defendant, it was the findings of the internal investigation that led to the termination of Plaintiff's employment on April 24, 2008. Pursuant to UPMC Mercy's grievance policy, Plaintiff attempted to pursue a grievance at four different levels but was not successful.

Plaintiff essentially contends that after he complained to Sister Hespelein, Volk "made it clear that she wanted him out of the Radiology Department, that she wanted to start accumulating infractions against Plaintiff so he could be fired, and that she "found an opportunity to fire Plaintiff" in Spring of 2008. In furtherance of this theory, Plaintiff claims that Volk communicated her "history" with Hussein to Dietz, but noted that she did not want to participate in the investigations because of this "history." Dietz then allegedly performed a sham investigation that led to UPMC's decision to terminate his employment.

In response, UPMC alleges that Hussein cannot adduce any evidence to support his contention that Volk participated in UPMC's decision to terminate his employment. Moreover, UPMC claims that any testimony concerning whether Haskins or Dietz knew about Volk's alleged personal animus towards Hussein constitutes inadmissible hearsay that cannot be considered for purposes of this motion.

**LEGAL ANALYSIS**

Defendants contend that the Complaint should be dismissed in its entirety. The Court will address each cause of action advocated by Plaintiff seriatim.

A.   <u>Religious Discrimination under Title VII and the PHRA: Denial of Leave Request</u>

Title VII makes it unlawful for an employer "to discriminate against any individual with

respect to his [or her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1); *see also Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760 (3d Cir. 2004).  The United States Court of Appeals for the Third Circuit recognizes two theories of religious discrimination: a "failure to accommodate" and "disparate treatment."  *Abramson v. William Paterson College*, 260 F.3d 265, 281 (3d Cir. 2001) (citing *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017 (4th Cir. 1996); *Mann v. Frank*, 7 F.3d 1365, 1368-70 (8th Cir. 1993).

In the case at bar, Plaintiff appears to allege both a failure to make a reasonable accommodation for his religious beliefs and a claim of disparate treatment.  *Compare* Doc. No. 1 at 4, ¶ 19 (averring that Volk's "decision [to not grant Hussein's vacation request] failed to make a reasonable accommodation to the Plaintiff so he could observe an important religious ceremony") *with* Doc. No. 1 at 3, ¶ 17 (averring that Volk's denial of his request "favored the Christian employees over the Muslim.")  In moving for summary judgment, Defendant's brief construes this discrimination claim as one of disparate treatment and does not address the claim of a failure to accommodate, a framing of the issue not challenged by Plaintiff in opposing Defendant's motion.  Contributing somewhat to the blurring of the particular claims which are being pursued, in moving for summary judgment in his own right, Plaintiff focuses solely on his retaliation allegations.  *See* Doc. Nos. 31 and 32.  Nevertheless, the Court cannot ignore the specific claims raised in the complaint, and will consider Plaintiff's claims under both theories of the alleged religious discrimination under Title VII.

1.  <u>Reasonable Accommodation</u>

Title VII makes it unlawful to discriminate against an employee on the basis of religion. 42 U.S.C. § 2000e-2(a).  The Act creates the "failure to accommodate" theory of religious

discrimination by including within the definition of 'religion' "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's … religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e-2(j). The prima facie case for a claim of a failure to accommodate, considered as part of the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), consists of three elements: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Abramson,* 260 F.3d at 281 (quoting *Protos v. Volkswagen of America, Inc.*, 797 F.2d 129, 133 (3d Cir.1986). "The analysis of any religious accommodation case begins with the question of whether the employee has established a prima facie case of religious discrimination." *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir.1987), *cert. denied*, 485 U.S. 989, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988).

It is important to consider what a constitutionally protected religious observance is, as compared to a desire or preference that is not subject to accommodation. While the U.S. Supreme Court has counseled that "it is no business of courts to say ... what is a religious practice or activity", *Fowler v. Rhode Island*, 345 U.S. 67, 70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953), it has also described a "religious" belief which is entitled to constitutional or statutory protection as "not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living." *Wisconsin v. Yoder*, 406 U.S. 205, 215-16, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *see also Brown v. General Motors*

*Corp.*, 601 F.2d 956, 960 (8th Cir. 1979)(Title VII "does not require an employer to reasonably accommodate the purely personal preferences of its employees.")

In this case, the Court finds that Plaintiff's desire to make a second pilgrimage to Mecca to be a religious observance, yet further finds that Plaintiff's desire to make a second pilgrimage to Mecca in December 2006 to be a matter of personal preference. *Cf.*, *Jiglov v. Hotel Peabody, G.P.*, 719 F.Supp.2d 918, 929 (WD Tenn. 2010)("an employee's desire to make a religious pilgrimage is a protected observance entitled to accommodation; the employee's desire to make the pilgrimage, which could be made at any time, at a time of her own choosing is a matter of personal preference"). To that end, the Court notes the following uncontroverted record evidence: 1) that, in Plaintiff's own words, only one pilgrimage was required based upon the tenets of his belief, although additional trips were not discouraged; 2) that Plaintiff had already previously made a pilgrimage in 1996, 3) that the timing of his request had less to do with any temporal demand to make a pilgrimage in December 2006 than it did to take advantage of the opportunity to benefit from a reduced price to travel as part of a larger group; and 4) that he was able to make the pilgrimage the following year. Taken together, the Court finds that Plaintiff has failed to present a prima facie case of Defendant's failure to accommodate his religious belief. His desire to travel in December 2006 was a matter of personal preference, as opposed to a religious observance entitled to constitutional or statutory protection. *Cf., Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 682-83 (9th Cir.1998)(timing of employee's religious pilgrimage was matter of personal preference rather than part of a bona fide religious belief); *see also Loftus v. Blue Cross Blue Shield of Michigan*, No. 08-13397, 2010 WL 1139338, at *5 (E.D.Mich. Mar. 24, 2010) (dismissing accommodation claim where Plaintiff's desire to travel to the Holy Land for six months was based on his personal preference rather than a religious obligation).

To be clear, despite the finding in this regard, the Court is not in any way diminishing the significance of Plaintiff's desire to make a second pilgrimage to Mecca. There is nothing in the record to suggest that his desire to do so was anything other than an exercise of his religious beliefs. At the same time, however, that desire, no matter how sincerely espoused, does not rise to a level sufficient to legally support an actionable claim of failure to accommodate under these circumstances. As such, Plaintiff's claim fails at the first element of the *prima facie* case of his failure to accommodate claim, and summary judgment will be granted to Defendant on this claim.

2. Disparate Treatment

To establish a *prima facie* case for religious discrimination under the disparate treatment theory, Plaintiff must establish that: (1) he was a member of a protected class; (2) he suffered an adverse employment action; and (3) that nonmembers of the protected class received more favorable treatment. *Abramson*, 260 F.3d at 281-82 (citing *Goosby v. Johnson & Johnson Med., Inc.,* 228 F.3d 313, 318-19 (3d Cir. 2000) (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 522 (3d Cir. 1992)). After a plaintiff establishes a *prima facie* case, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment decision. *Abramson*, 260 F.3d at 282. "If the employer is able to proffer a legitimate, nondiscriminatory reason for its actions, the plaintiff must demonstrate that the proffered reason was merely a pretext for unlawful discrimination." *Goosby,* 228 F.3d at 319 (citing *Reeves v. Sanderson Plumbing Products Inc.*, 530 U.S. 248, 254-56 (2000). However, the task of the Court is not to second-guess employment decisions, but is instead to determine whether the employment decisions were motivated by an illegal discriminatory purpose. *Ezold*, 983 F.2d at 526-27

Plaintiff contends that Volk's denial of his June 12, 2006 vacation request constitutes

religious discrimination.  In support of his discrimination claim, Hussein alleges that he consistently covered the absences of Christian employees who took their vacation over the Christmas holiday, argues that any staffing concerns were baseless because Volk could have adjusted the schedule to provide sufficient coverage, and claims that Volk's decision discriminatorily favored the Christian employees over him, a Muslim.

Defendant does not contest Plaintiff's *prima facie* case with respect to elements one and two.  Defendant argues that Plaintiff cannot establish the third element of his *prima facie* case for discrimination, *i.e.*, that non-Muslims were treated more favorably.  The Court agrees that Plaintiff has failed to establish a *prima facie* case.  The uncontroverted evidentiary record demonstrates that under the all-encompassing vacation policy of the employer at the time, Plaintiff was entitled to have the first selection in choosing his period(s) of vacation, and his own freely made decision at the time required was to not take vacation during the period in and around the Christmas holidays.  In fact, Plaintiff conceded that non-Muslims did not receive more favorable treatment; specifically testifying as follows:

> Q:   And is it you position that only Christians were able to take off at the Christmas holiday?
>
> A:   No.  Anybody could take it during the Christmastime, but I felt like whenever the Christmas holiday came around, all of my co-workers wanted Christmastime off to be with their families, and I being a Muslim, I don't celebrate Christmas.  So I did not mind, you know, them taking time off for Christmas, and I would cover calls for them . . .
>
> Q:   Mercy Hospital did not have a policy or a practice to just let Christians take off during the Christmas season; isn't that correct?
>
> A:   That is correct.

(Doc. No. 28-2 at 181-82) (Deposition of Mohammad Hussein).  The record is clear that all employees were held to the same standard under a department policy in terms of selecting

periods of vacation, Plaintiff had the opportunity, and even had first priority, to select his vacation time under that policy, and Plaintiff simply choose not to take vacation during the Christmas holiday period. Plaintiff's *post hoc* attempt to recast his own free choice to not take vacation during Christmas as disparate treatment is entirely without merit.

Assuming *arguendo* that Plaintiff had established a *prima facie* case of discrimination, the Court would nevertheless grant summary judgment because the Court finds and rules that Plaintiff has failed to adduce any evidence from which a reasonable factfinder could (1) disbelieve Defendants' articulated nondiscriminatory reasons, or (2) otherwise believe that an invidious discriminatory reason was more than not a motivating or determinative cause for denial of Plaintiff's untimely request for vacation. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

Plaintiff has not adduced any evidence to counter Defendant's legitimate, non-discriminatory reason for its decision to deny his June 2006 request for leave, *i.e.*, the vacation policy of the radiology department and the staffing concerns of Volk. Indeed, Plaintiff concedes that his vacation request was four months late under the vacation policy of his department and admits to the possibility that Volk denied his request because another technologist had already scheduled vacation for the time period he requested. Plaintiff has also failed to adduce any evidence in the summary judgment record, beyond his bald assertions, to demonstrate that the decision to deny his request for leave, itself based upon the staffing concerns of Volk, were baseless. In fact, to Plaintiff's suggestion that Volk should have readjusted the vacation schedules of other employees in order to accommodate his untimely request, is itself, a demand for disparate (i.e., favorable) treatment. Unfulfilled unilateral expectations for favorable treatment in order to overcome his own untimely request for vacation do not give Plaintiff an

actionable discrimination claim.

B.    Retaliation Claims Brought Under Title VII and the PHRA

Plaintiff alleges that the termination of his employment in April 2008 was in retaliation for his opposition to religious discrimination, specifically taken in response to his complaints to Sister Patricia Hespelein regarding the denial of his June 2006 request for vacation. *See* Doc. No. 1 at ¶¶ 20 – 30. Title VII provides, in pertinent part, as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

*42 U.S.C. § 2000e-3(a)*. To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: (i) he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340 (3d Cir. 2006). Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII. *Id.* at 341.

It is not necessary for a plaintiff to prove the merits of any underlying discrimination complaint in order to invoke the anti-retaliation protection of Title VII. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996). A plaintiff need only have a "good faith, reasonable belief that a violation existed." *Id.* Thus even though Plaintiff does not have a valid claim under Title VII for religious discrimination, he could still prevail on his Title VII

retaliation claim. Retaliation claims follow the familiar *McDonnell-Douglas* burden-shifting approach.

Plaintiff argues that his employment termination was the culminating act of discrimination directed against him for his religious beliefs, seeking an accommodation for his pilgrimage, and lodging complaints to upper-level management about the denial of his vacation request. In response, Defendant maintains that his falsification of records and dishonesty warranted the termination of his employment.

As discussed *supra*, the summary judgment evidentiary record reflects that the termination letter Plaintiff received cited legitimate, nondiscriminatory reasons for UPMC's decision, which included Plaintiff's conduct on April 3, 2008, and April 12, 2008. UPMC also notes that the record reflects numerous corrective disciplinary action forms that highlight Plaintiff's multiple performance-related deficiencies. As a result, the Court finds that Defendant has met its burden of providing legitimate, nondiscriminatory reasons for its termination of Plaintiff's employment.

Conversely, based on the summary judgment record evidence, the Court finds that Plaintiff has failed to adduce any evidence from which a reasonable factfinder could find that UPMC's real reason for terminating Plaintiff's employment was discriminatory animus. *Reeves*, 530 U.S. at 146-47. In order to meet this final burden, Plaintiff cannot merely show that the employer's decision was wrong or mistaken, but must provide evidence from which a reasonable factfinder could infer that each of the reasons proffered by the employer "was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Fuentes*, 32 F.3d at 765. Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that

a reasonable factfinder could rationally find them 'unworthy of credence." *Id.*

The evidence proffered by Plaintiff to establish UPMC's alleged discriminatory animus toward him are (1) a conversation between Dietz and Volk where the latter supposedly communicated her "history" with Plaintiff, (2) statements Volk allegedly made to her managerial subordinates about her "history" with Plaintiff that purportedly tainted the investigation; and (3) supposed claims of Volk allegedly voicing her general dislike of Hussein. Moreover, Plaintiff attempts to demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions by highlighting that (1) Boros no longer objects to Hussein having placed her initials on the north camera quality control sheet; (2) Boros admits to the possibility that she initialed the south camera quality control sheet and thus, the transcription of "falsification" on that control sheet is inaccurate; and (3) Hussein orally communicating the suboptimal nature of the renal scan pictures to the radiologist excuses his failure to report the missing images in the patient's medical records and refutes Haskins' reasons for terminating Hussein.

Plaintiff's premise for retaliation itself is, at best, speculative. Plaintiff admits that Volk, the person with alleged retaliatory motives, did not participate in either the internal investigation into his instances of misconduct or in the decision to terminate his employment. Beyond that, however, Plaintiff admits that he is unaware whether Sister Hespelein ever communicated his complaints to Volk. Sister Hespelein does not recall voicing Hussein's concerns, and the statements by those individuals who allegedly heard that Sister Hespelein passed along Hussein's complaints to Volk are clearly second-hand and constitute inadmissible hearsay.

Based on the totality of the record evidence, the Court finds and rules that Plaintiff has failed to adduce any evidence to demonstrate that the challenged act of his termination is more likely than not based on retaliation. Therefore, Defendant's motion for summary judgment as to

Plaintiff's retaliation claim will be granted.

C.    National Origin Discrimination

To demonstrate a prima facie case of national origin discrimination, a plaintiff must show: (1) that he is a member of a protected class; (2) he was qualified for the position for which he applied; (3) he was not selected for the position; and (4) another individual, who was not a member of the protected class, acquired the position or the position remained open. *Scheidemantle v. Slippery Rock University State System of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006).

Defendants argue that Plaintiff has failed to establish the third prong of his *prima facie* case of national origin discrimination. Plaintiff replies that he "is not going to argue against the Defendant's Motion for Summary Judgment on Plaintiff's claim[] of National Origin Discrimination." (Doc. No. 41 at 2, n. 1).

A review of the summary judgment record reflects that Plaintiff admits that he does not have any factual basis to prove that non-Pakistanis or those not of South Asian descent received favorable treatment. At his deposition, he testified as follows:

Q:    What is the—on what basis do you believe that Becky Volk discriminated against you because of your race?

A:    Because she was—before the time Becky Volk came, I don't remember, recalling any other director ever writing me up. As soon as she came onboard, she just kept writing me up for everything.

Q:    What makes you believes that had to do with your race?

A:    That was probably discrimination, she probably didn't like foreigners.

Q:    But you don't have any basis to believe that?

A:    No.

Q:    You have no facts to form the basis for that belief, correct?

A:     Correct

Doc. No. 82-2 at 172 (Deposition of Mohammad Hussein).  Thus, Hussein has failed to provide

any factual support beyond his own conjecture and speculation, Defendant's motion for

summary judgment as to Plaintiff's national origin discrimination claim will be granted.

D.     Age Discrimination

To establish a prima facie case of age discrimination under the ADEA, a plaintiff must

establish that: (1) he was over 40 at the time he applied for the position in question; (2) he

suffered an adverse employment decision; (3) he is qualified for the position; and (4) the

employer gave favorable treatment to someone sufficiently younger to permit an inference of age

discrimination.  *Showalter v. Univ. of Pittsburgh Med. Ctr.,* 190 F.3d 231, 234 (3d Cir. 1999);

*see also Hicks v. The Tech Industries*, 512 F. Supp. 2d 338, 347-48 (W.D. Pa. 2007) (noting that

while the "fourth prong is not entirely rigid," a "reasonable inference of age cannot be drawn

from the replacement of one worker with another insignificantly younger") (internal citations

omitted).   Additionally, plaintiffs pursuing claims of age discrimination under the ADEA will be

held to a more stringent "but for" standard.  *See Gross v. FBL Financial Serices, Inc*., -- U.S. --,

129 S. Ct. 2343 (2009).

Defendant contends that Plaintiff fails to meet this standard since he also bases his

termination upon national origin discrimination and religious discrimination.  In response,

Plaintiff states that he "is not going to argue against the Defendant's Motion for Summary

Judgment on Plaintiff's claim[] of Age Discrimination."  (Doc. No. 41 at 2, n. 1).

Although the analysis of this matter could end with the application of the "but for"

standard, the Court also notes that Hussein claim for age discrimination is, admittedly,

speculative in its entirety.  More specifically, Hussein testified as follows:

Q: And will you admit you don't have any facts to show that Becky Volk discriminated against you because of your age?

A: She may have—age may have had something to do too.

Q: May have something to do and did have something to do are two different things.

A: You know, did have something to do with it.

Q: What facts do you have—

A: I don't have any facts. I am just speculating.

Doc. No. 82-2 at 176 (Depo. Tr. of Plaintiff). Therefore, since Plaintiff has failed to provide any evidentiary facts beyond his admitted speculation and Defendant has advanced a legitimate, nondiscriminatory reason his termination, Defendant's motion for summary judgment as to the Age Discrimination claim of Plaintiff will be granted.

E.    PHRA

Pennsylvania courts generally interpret the PHRA in accordance with its federal counterparts. *See Kelly v. Drexel Univ.*, 94 F.3d 102, 104 (3d Cir. 1996); *Gomez v. Allegheny Health Servs. Inc.*, 71 F.3d 1079, 1084 (3d Cir. 1995).. The PHRA is to be interpreted "as identical to federal anti-discrimination laws except where there is something specifically different in its language" justifying different treatment. *Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561, 567 (3d Cir. 2002).

Neither party specifically addresses the PHRA claim, nor argues that the PHRA should be interpreted differently from federal law in this case. Therefore, this Court will interpret the PHRA "as applying identically in this case and governed by the same set of precedents" as the relevant provisions of the applicable federal anti-discrimination statutes. *Id.*

In his complaint, Hussein alleges that Mercy has discriminated against Plaintiff because of his religion, national origin and age in violation of the PHRA. However, based on the

foregoing analyses of the PHRA's federal counterparts, the Court will dismiss the pendant PHRA state claims.

F.     Plaintiff's motion for summary judgment

In addition to Defendant's motion for summary judgment (Doc. No. 25), before the Court is Plaintiff's motion for summary judgment (Doc. No. 29).  In view of the fact that Defendant's motion will be granted, Plaintiff's motion for summary judgment will be denied.

## CONCLUSION

For the reasons hereinabove stated, the Court finds that Plaintiff has not demonstrated by any record evidence that Defendant discriminated against him on the basis of his religion, national, origin, or age, or that Defendant retaliated against Plaintiff for the complaints he levied about the denial of his vacation request.  Therefore, the Defendant's Motion for Summary Judgment will be granted in its entirety and Plaintiff's Motion for Summary Judgment will be denied.  An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MOHAMMED HUSSEIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **2:09-cv-00547** |
| **vs.** | ) | |
| | ) | |
| **UPMC MERCY HOSPITAL** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**ORDER OF THE COURT**</u>

AND NOW, this <u>4th</u> day of January, 2011, for the reasons set forth in the foregoing

Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED** and **DECREED** as follows:

(1) the MOTION FOR SUMMARY JUDGMENT (Document No. 26) filed by Defendant

is **GRANTED**; and

(2) the MOTION FOR SUMMARY JUDGMENT (Document No. 29) filed by Plaintiff is

**DENIED**.

It is further **ORDERED** that Plaintiff's Complaint is dismissed with prejudice. The clerk

shall docket this case closed.


BY THE COURT:

<u>/s/ Terrence F. McVerry</u>
United States District Court Judge



cc: All Counsel of Record